UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

AMANDA J. NEWTON,

       Plaintiff                   Civil Action No. 15-10331

v.                             HON. ARTHUR J. TARNOW
                                   U.S. District Judge
                                   HON. R.  STEVEN WHALEN

COMMISSIONER OF SOCIAL       U.S. Magistrate Judge
SECURITY,

       Defendant.

_____/

## REPORT AND RECOMMENDATION

Plaintiff Amanda J. Newton brings this action pursuant to 42 U.S.C. §405(g), challenging a final decision of Defendant Commissioner denying her application for Disability Insurance Benefits and Supplemental Security Income under the Social Security Act.  Both parties have filed summary judgment motions which have been referred for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).  For the reasons set forth below, I recommend that Defendant's motion for summary judgment be GRANTED and that Plaintiff's motion for summary judgment be DENIED.

## I.  PROCEDURAL HISTORY

On August 22, 2011,  Plaintiff filed applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"), alleging disability as of July 5, 2010 (Tr.174-182).  After the initial denial of the claim, Plaintiff filed a timely request for an

administrative hearing, held on July 26, 2013 in Toledo, Ohio before Administrative Law Judge ("ALJ") Kim L. Bright (Tr. 44). Plaintiff, represented by attorney Frank Cusmano, testified, as did Vocational Expert ("VE") Charles McBee (Tr. 50-72, 72-86). On August 28, 2013, ALJ Bright found that Plaintiff was not disabled (Tr. 25-39). On October 24, 2014, the Appeals Council denied review (Tr. 7-12). Plaintiff filed for judicial review of the final decision on January 26, 2015.

## II.  BACKGROUND FACTS

Plaintiff, born September 3, 1980, was just short of her 33rd birthday when the ALJ issued her decision (Tr. 39, 174). Plaintiff completed high school and received training as a Certified Nurse Assistant ("CNA") (Tr. 204). She worked previously as an assistant manager for the Humane Society, CNA, receptionist, and store clerk (Tr. 204). She alleges disability as a result of Lyme disease, depression, anemia, chronic fatigue, back problems, fibromyalgia, anxiety, irritable bowel syndrome ("IBS"), diverticulitis, neuropathy, and endometriosis (Tr. 263).

### A.    Plaintiff's Testimony

Plaintiff offered the following testimony:

Plaintiff was 32, stood 5'1' and weighed 191 pounds (Tr. 50). She had recently lost weight due to stomach problems (Tr. 50). She was married and had three children: a daughter, 15; a step-son, 12; and a son, 7 (Tr. 51). She lived in a one-story house with a basement (Tr. 52). Her husband was employed (Tr. 52). She held a current driver's license

-2-

and drove four to five days a week (Tr. 52). She was unable to drive at night due to an astigmatism and was unable to drive for long distances due to her back condition (Tr. 52). She received CNA certification in 2006 (Tr. 53). Before the alleged onset of disability, she worked most recently as a receptionist in a doctor's office (Tr. 54).

On a typical day, she first fed her children and otherwise attended to their needs (Tr. 55). Then, she would attend to her own personal needs (Tr. 55). She was required to give herself written reminders due to her concentrational problems (Tr. 55). She would take a nap at 12:00 or 1:00 p.m. due to pain from Lyme disease (Tr. 55). Later, when her husband came home, they would prepare dinner together and after dinner, she would lie down or "stay up" until her children went to bed (Tr. 55). She currently took B-12, Zoloft, Neurontin, Protonix Synthroid, Norco, Magnesium, Loratadine, Vitamin D3, Diflucan, Bactrim, Cymbalta, Flexeril, Zofran, Imodium, and a Symbicort inhaler (Tr. 56-57). Side effects included dizziness, fatigue, and dry mouth (Tr. 58).

She was diagnosed with Lyme disease in 2008 (Tr. 58). Lyme disease caused the side effects of back pain, lower limb neuropathy, and tremors (Tr. 59). In the past, she had treated her conditions with physical therapy, pain blocks, and chiropractic adjustments (Tr. 59-60). She previously experienced cramping on and off, but the cramps had worsened in recent months (Tr. 60). She started seeing a therapist and a psychiatrist about two months before the hearing (Tr. 61-62). She had been hospitalized for psychiatric symptoms in 2010 (Tr. 62). She experienced anxiety "being around a lot of people" (Tr. 62). She denied using

-3-

marijuana for the past year (Tr. 63).  She experienced concentrational problems, staying on task, and fatigue (Tr. 63).  If she were to work, she "wouldn't be reliable" due to her need to call in sick or go to the hospital (Tr. 63).

In response to questioning by her attorney, Plaintiff reported that she had been treating with her primary care provider (Dr. Dona) most of her life (Tr. 64).  She testified that she also received treatment every four to six weeks from Dr. Ledtke, whom she described as a "Lyme-literate medical doctor" (Tr. 65).  She alleged that the symptoms of fatigue, muscular pain, and depression had worsened over time (Tr. 66).  She reported the symptoms of vomiting and diarrhea as a result of IBS, noting that her gallbladder had been previously removed (Tr. 66).  She reported that she had problems completing tasks due to racing thoughts combined with physical problems and anxiety (Tr. 67).  She reiterated that fatigue from her conditions obliged her to take at least one nap every day (Tr. 67).  She reported four to five "bad" days a week (Tr. 68).  She testified that she coped with childcare responsibilities with the help of her daughter, 15, and her husband (Tr. 69).  She alleged that she was unable to return to her work as a receptionist due to pain, concentrational problems, and Carpal Tunnel Syndrome ("CTS") (Tr. 71).  In response to questioning by the ALJ, Plaintiff reported that she was diagnosed with CTS in 2010 and wore wrist splints (Tr. 72).

-4-

### B.    Medical Evidence

### 1. Treating Sources[1]

A January, 2009 EMG was essentially "normal" with "low grade left S1 radiculopathy" (Tr. 1141). October, 2009 records by Danilo Dona, M.D. note Plaintiff's report of lower back and extremity pain (Tr. 421). Epidural injections were administered without complications (Tr. 430). The following month, an EMG study showed "mild, nondenervating bilateral [CTS]" (Tr. 1140). December, 2009 studies were negative for arterial disease (Tr. 420). Dr. Dona noted that Plaintiff had undergone a hysterectomy in May, 2009 (Tr. 422). Plaintiff reported cervical and lumbar spine tenderness and a limited range of motion (Tr. 422-424). The examination was otherwise essentially normal (Tr. 422-425). Dr. Dona noted that Plaintiff's psychological condition was wholly normal, including "good concentration," "good ability to follow command," "good recent [and] good remote memory," and good "comprehension" (Tr. 425). An MRI of the lumbar spine showed a disc bulge at L5-S1 with otherwise mild or "minimal" abnormalities (Tr. 426). Imaging studies conducted in response to Plaintiff's complaints of shortness of breath were unremarkable (Tr. 417).

A January, 2010 echocardiogram was unremarkable (Tr. 411-412). An ultrasound of the abdomen was unremarkable (Tr. 410). Counseling notes from the following month state

---

[1]Treating records significantly predating the alleged onset of disability date of July 5, 2010 or unrelated to the disability claim have been reviewed in full but are omitted from the present discussion.

a diagnosis of depression, noting that Plaintiff would be taken off Zoloft and prescribed Cymbalta to address the conditions of depression, anxiety, and fibromyalgia (Tr. 403). The following week, Plaintiff was admitted for voluntary inpatient treatment after reporting suicidal thoughts (Tr. 401). Treating records note that Plaintiff's psychotropic medication was changed the previous week (Tr. 401). The following week, rheumatologist Mazen Elyan, M.D. encouraged Plaintiff "to get involved in aerobic exercise on [a] daily basis" to address symptoms of fibromyalgia (Tr. 400). He noted that Plaintiff had "a positive antibody" for Lyme disease, referring her to a specialist for confirmation (Tr. 400).

A May, 2010 chest x-ray was normal (Tr. 398). A venous duplex scan of the lower extremities was negative for thrombosis (Tr. 388). A June, 2010 study showed the presence of a kidney stone (Tr. 371, 386-387). The same month, James Sunstrum, M.D. noted that blood work was "questionable" as to "whether [Plaintiff] really had Lyme disease," adding that she had taken "special antibiotics to cover this possibility" (Tr. 368). He noted that her "other chronic complaints [were] very vague in nature and are unlikely to represent any infection" (Tr. 368). A chest x-ray from July, 2010 was unremarkable (Tr. 367). Imaging studies of the lower extremities were negative for thrombosis (Tr. 363). A physical examination by Dr. Dona was normal (Tr. 638). The same month, an EMG study of the lower extremities was negative for either radiculopathy or peripheral neuropathy (Tr. 352-354). An August, 2010 bone scan of the lower legs and feet was normal (Tr. 347). The same month, imaging studies were once again negative for thrombosis (Tr. 345). Physical

-6-

examination notes by Dr. Dona note Plaintiff's report of joint pain and stiffness and myalgia (Tr. 631). Later the same month, she was diagnosed with cellulitis of the leg (Tr. 629-630).

In October, 2010, Plaintiff was admitted after reporting "fever, chills, and pain" in the lower abdomen (Tr. 333). Imaging studies of the abdomen were normal (Tr. 335). She was diagnosed with gastroesophageal reflux disease and an infected cyst (Tr. 322, 328). Treating notes state that Plaintiff experienced good results from Zoloft but reported that she felt "down" every third day (Tr. 325). Nihal Saran, M.D. noted that Plaintiff denied memory problems (Tr. 326). He recommended that Plaintiff add Wellbutrin to the Zoloft for better results (Tr. 326). She was discharged after reporting good physical and mental improvement (Tr. 323). The following month, an MRI of the lumbar spine showed mild degenerative changes (Tr. 309-310). Plaintiff reported that she had recently quit smoking and currently weighed 228 pounds (Tr. 306-308). She was advised to lose weight and exercise (Tr. 308). The same month, she was treated for anemia (Tr. 297). Treating notes from later the same month show that the anemia had resolved (Tr. 281).

A January, 2011 abdominal scan was unremarkable (Tr. 272, 876). In March, 2011, she sought treatment for an abscess of the left underarm (Tr. 827-829, 853, 870, 894). An ultrasound of the pancreas from later the same month were unremarkable (Tr. 809, 879). An April, 2011 CT of the head was unremarkable (Tr. 808, 880). A chest x-ray ordered in response to Plaintiff's report of chest pain was also normal (Tr. 616, 807, 881).

In July and August, 2011, laproscopic surgery for ovarian cysts was performed

without complications (Tr. 585, 591, 802, 898, 901). July, 2011 treating records by Michael Ledtke, M.D. note Plaintiff's reports of fatigue, sleep disturbances, snoring, night sweats, depression, anxiety, stress, burping, heartburn, nausea, and multiple cysts (Tr. 910-911). Plaintiff reported yeast infections (Tr. 911). Dr. Ledtke noted diagnoses of spirochetal and "questionable Lyme" (Tr. 919). He noted that one possible indicator of Lyme disease was positive but other testing was normal (Tr. 917). He prescribed B-12, Coenzyme Q10, and Pravastatin (Tr. 917). He diagnosed Plaintiff with Lyme disease and chronic Candidiasis (Tr. 917). A July, 2011 chest x-ray was normal (Tr. 882). In late August, 2011, she was treated for possible diverticulitis (Tr. 799, 850, 868). She reported smoking one pack of cigarettes each day (Tr. 781, 798, 868). A CT of the abdomen was normal (Tr. 791, 796, 883). On October, 2011, she was diagnosed with mild chronic gastritis (Tr. 612, 776, 780, 786, 874, 886, 903). Imaging studies were positive for a "small amount of gallbladder sludge" but were otherwise normal (Tr. 775, 779, 784). A chest x-ray was normal (Tr. 888). The following month, an x-ray of the neck was unremarkable (Tr. 773, 889, 1062). She was admitted for treatment for a rash (Tr. 770, 865, 1004, 1054, 1058). In December, 2011, Dr. Ledtke noted that the recent rash was attributable to Doxycycline (Tr. 912, 996). Plaintiff reported scalp crustiness (Tr. 912). Dr. Ledtke opined that "candida is more of a player here than the concern about Lyme at this point" (Tr. 912, 1030).

In April, 2012, Plaintiff sought emergency treatment for migraine headaches (Tr. 945). She was released in improved condition (Tr. 947, 974). June, 2012 counseling records note

a depressed mood with limited memory but a pleasant appearance and organized thought process (Tr. 1013, 1015). She was assigned a GAF of 53 with a "good" prognosis[2] (Tr. 1016). In July, 2012, she sought emergency treatment for symptoms of IBS including nausea, vomiting, and diarrhea (Tr. 947, 974, 1040). Imaging studies were unremarkable (Tr. 952, 1043-1046). Plaintiff agains sought emergency treatment for abdominal pain in October, 2012 (Tr. 958, 974, 1129). The following month, she exhibited a normal range of motion and no tenderness (Tr. 970, 1073, 1121). A CT of the abdomen was unremarkable except for a kidney stone (Tr. 970-971, 116).

A January, 2013 CT of the head was unremarkable (Tr. 977). Dr. Ledtke's notes state that Plaintiff's skin abscesses had cleared (Tr. 1026). The following month, she sought emergency treatment for chest wall muscle strain (Tr. 987). Ultrasounds of the kidneys and abdomen were normal (Tr. 1106, 1108). In April, 2013 treating notes by Dr. Ledtke state that Plaintiff was prescribed Diblucan for candida (Tr. 1024). Plaintiff sought treatment later the same month for nausea (Tr. 986). A CT of the abdomen and a chest x-ray were both unremarkable (Tr. 990, 1077, 1099-1101). An ultrasound of the abdomen was unremarkable (Tr. 1102). May, 2013, treating records by Murphy Madeira, M.D. note Plaintiff's report of night sweats and blurred vision (Tr. 1096). The same month, Plaintiff communicated with Dr. Ledtke by telephone, noting "the sweats" and headaches were improving with her current

---

[2]A GAF score of 51-60 indicates moderate symptoms (occasional panic attacks) or moderate difficulty in social, occupational, or school functioning. *Diagnostic and Statistical Manual of Mental Disorders--Text Revision,* 34 ("*DSM-IV-TR*" )(4th ed.2000).

medication (Tr. 1022). The same month, a strep screen by Dr. Dona was negative (Tr. 1069). Lesa Chopra, D.O. noted Plaintiff's complaints of pain after eating fried foods (Tr. 1079). A bone scan was unremarkable (Tr. 1085). A stool sample was negative for abnormalities (Tr. 1091). June, 2013 ultrasounds of the abdomen were unremarkable (Tr. 1083-1084). Dr. Dona's July, 2013 records note complaints of abdominal pain (Tr. 1064, 1081).

### 2. Consultative and Non-Examining Sources

In February, 2011 Terrance Mills, Ph.D. performed a consultative examination of Plaintiff on behalf of the SSA, noting Plaintiff's report of long-term marijuana dependence (Tr. 575). She reported a positive relationship with her family and coworkers (Tr. 576). Plaintiff reported that her mood was "'up and down'" (Tr. 576). Dr. Mills found the presence of depression and "panic order without agoraphobia;" cannabis dependence; a personality disorder; and "severe" health and employment problems (Tr. 577). He assigned her a GAF of 50[3] but found that Plaintiff could "understand, retain, and follow simple instructions and perform basic routine tasks" (Tr. 577). He found that she was capable of managing her financial affairs (Tr. 577).

In February, 2012, Sergio Bello, M.D. performed a non-examining review of Plaintiff's treating and consultative records, finding that the condition of Hidradenitis

---

[3]A GAF score of 41-50 indicates "[s]erious symptoms ... [or] serious impairment in social, occupational, or school functioning," such as inability to keep a job. *Diagnostic and Statistical Manual of Mental Disorders--Text Revision,* 34 ("*DSM-IV-TR*" )(4th ed. 2000).

Suppurativa was not disabling (Tr. 930). He found that Plaintiff could lift 20 pounds occasionally and 10 frequently; stand, sit, or walk for about six hours in an eight-hour workday; and push or pull without limitation (Tr. 932, 938).

In May, 2012, psychologist Gayle Oliver Brannon, Ph.D. performed a consultative examination, noting Plaintiff's allegations of crying jags, moodiness, agitation, feelings of hopelessness and shortness of temper (Tr. 939). Plaintiff admitted that she could care for her personal needs and on "some days," did household chores, cooking, and shopping (Tr. 940). Dr. Brannon assigned Plaintiff a GAF of 49 with a guarded prognosis (Tr. 942). She found that Plaintiff would "benefit from counseling or supportive psychotherapy to treat mood issues. . ." (Tr. 942). She found that Plaintiff was capable of managing her benefit funds (Tr. 942).

### C.   Vocational Expert Testimony

VE Charles McBee classified Plaintiff's former work as a receptionist as semiskilled and sedentary[4] and work as a CNA, semiskilled/medium (Tr. 76). He testified that his findings were consistent with the information found in the Dictionary of Occupational Titles ("DOT") (Tr. 62). The ALJ then described a hypothetical individual of Plaintiff's age,

---

[4]20 C.F.R. § 404.1567(a-d) defines *sedentary* work as "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools; *light* work as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds;" *medium* work as "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds;" and that exertionally *heavy* work "involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds.

education, and work history:

> [An ] individual . . . who could perform light work . . . . The individual must avoid even moderate exposure to fumes, odors, dust, gases, and poor ventilation.  They retain the ability to perform simple, routine tasks consistent with unskilled work.  Could such an individual perform any of the past jobs described as actually performed [or] as performed in the national economy? (Tr. 76)?

The VE stated that the above limitations would preclude the individual from performing Plaintiff's past relevant work but allow for the light/unskilled work of a shipping and receiving weigher (2,000 positions in the State of Michigan); small products assembler (6,000 to 8,000); and photocopy machine operator (2,500) (Tr. 76-77).   The VE found that if the hypothetical limitations omitted the restriction to "simple, routine tasks consistent with unskilled work," the individual could perform the past relevant work of a receptionist (Tr. 77).   The VE testified further that if restrictions of avoidance of "even moderate exposure to fumes, odors, dust, gases, and poor ventilation" were added to the modified hypothetical, the individual could perform the work of a receptionist (Tr. 78).

The VE also testified that the same individual could perform the unskilled sedentary work of a telephone quotation clerk (2,500); unskilled, sedentary work of a document preparer (10,000); and  hand mounter (300 to 500) (Tr. 79).  The VE testified that if the same individual required a sit/stand at will option, the work of a shipping and receiving weigher would be eliminated, but the individual could perform the light work of an inspector or hand packager (Tr. 4,000) (Tr. 80).  The VE testified that if the additional limitation of "frequently handle and finger" were added to the hypothetical modifiers, it would not change the result

-12-

as to either the past relevant work or the "other" work (Tr. 81). The VE added that if the individual were further limited to "superficial interactions with coworkers, supervisors, and the public, the job findings would remain unchanged except for eliminating the job of telephone quotation clerk, but would allow for the additional, sedentary position of table worker (1,000)(Tr. 82-83). The VE testified that an additional limitation of "a static environment with few changes," would not change the job findings (Tr. 83).

In response to questioning by Plaintiff's attorney, the VE stated that if the same individual were limited to "occasional bilateral handling and fingering," all of the above-cited jobs would be eliminated (Tr. 85-86). She testified likewise that the need to lie down for a one-hour period each workday would eliminate all of the above jobs (Tr. 86).

### D.  The ALJ's Decision

Citing the medical transcript, ALJ Bright found that Plaintiff experienced the severe impairments of "Hidradenitis Suppurative (Lyme disease); osteoarthritis; major depressive disorder; anxiety disorder; and panic disorder without agoraphobia" but that none of the conditions met or medically equaled an impairment found in Part 404 Appendix 1 Subpart P, Appendix No. 1 (Tr. 27-28). She found that Plaintiff experienced no limitations in activities of daily living, mild deficiencies in activities in social functioning, and moderate limitation in concentration, persistence, or pace (Tr. 28-29). The ALJ found that Plaintiff retained the Residual Functional Capacity ("RFC") for light work with the following limitations:

-13-

[C]laimant should avoid even moderate exposure to fumes, odors, dust, gases, and poor ventilation. The claimant retains the ability to perform simple routine tasks consistent with unskilled work (Tr. 30).

Citing the VE's testimony, the ALJ found that while Plaintiff was unable to perform any of her past jobs, she could work as a shipping and receiving weigher, small products assembler, and photocopy machine operator (Tr. 37-38).

The ALJ discounted Plaintiff's allegations of disability. She found that Dr. Dona's treating notes (showing a full range of motion and a normal gait and coordination) did not support the claims of disability due to Lyme disease or any other condition (Tr. 33). The ALJ noted that while a February, 2010 blood test was positive for Lyme disease, a second blood test in May, 2010 was negative (Tr. 34). The ALJ cited Dr. Ledtke's 2013 treating notes stating that Plaintiff's head and body aches were improved with a medication change (Tr. 34). The ALJ noted that September, 2009 EMG studies showed only "mild, nondenervating bilateral [CTS]" (Tr. 32).

The ALJ observed that the alleged physical and mental limitations did not prevent Plaintiff from preparing meals for her children, driving them to school, doing laundry chores, shopping for groceries, and taking care of a pet (Tr. 28).

### III. STANDARD OF REVIEW

The district court reviews the final decision of the Commissioner to determine whether it is supported by substantial evidence. 42 U.S.C. §405(g); *Sherrill v. Secretary of Health and Human Services,* 757 F.2d 803, 804 (6th Cir. 1985). Substantial evidence is more

-14-

than a scintilla but less than a preponderance.   It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (*quoting Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, S. Ct. 206, 83 L.Ed.126 (1938)). The standard of review is deferential and "presupposes that there is a 'zone of choice' within which decision makers can go either way, without interference from the courts." *Mullen v. Bowen,*   800 F.2d 535, 545 (6th Cir. 1986)(en banc).  In determining whether the evidence is substantial, the court must "take into account whatever in the record fairly detracts from its weight." *Wages v. Secretary of Health & Human Services*, 755 F.2d 495, 497 (6th Cir. 1985). The court must examine the administrative record as a whole, and may look to any evidence in the record, regardless of whether it has been cited by the ALJ. *Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989).

## IV.  FRAMEWORK FOR DISABILITY DETERMINATIONS

Disability is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). In evaluating whether a claimant is disabled, the Commissioner is to consider, in sequence, whether the claimant: 1) worked during the alleged period of disability; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of an impairment

listed in the regulations; 4) can return to past relevant work; and 5) if not, whether he or she can perform other work in the national economy.  20 C.F.R. §416.920(a).  The Plaintiff has the burden of proof at steps one through four, but the burden shifts to the Commissioner at step five  to demonstrate that, "notwithstanding the claimant's impairment, he retains the residual functional capacity to perform specific jobs existing in the national economy." *Richardson v. Secretary of Health & Human Services,* 735 F.2d 962, 964 (6th Cir.1984).

## V.  ANALYSIS

### A.  The RFC

Plaintiff argues first that the RFC found in the administrative determination does not reflect her true degree of limitation.  *Plaintiff's Brief,* 11-23, *Docket #18.*  She contends that the ALJ failed to adequately address the allegations of limitations caused by Lyme disease. *Id.*  Plaintiff disputes the ALJ's finding that the treating and hospital records support the conclusion that she could perform a range of exertionally light work.  *Id.*   She also argues that the ALJ did not consider that her failure to seek frequent treatment from Dr. Ledtke was due financial constraints.  *Id.* at 20.  In addition, she argues that the ALJ conflated the conditions of Hidradenitis Suppurative and Lyme disease, noting that the ALJ found the former condition was a "severe" impairment at Step Two, followed by "Lyme disease" in parentheses.  *Id.* at 17-20 (citing Tr. 27).

The RFC describes an individual's residual abilities. *Howard v. Commissioner of Social Security,* 276 F.3d 235, 239 (6th Cir. 2002). "RFC is to be an 'assessment of

[Plaintiff's] remaining capacity for work' once her limitations have been taken into account"
*Id.* (*citing* 20 C.F.R. § 416.945). In determining a person's RFC, it is necessary to consider
(1) objective medical evidence as well as (2) subjective evidence of pain or disability. 20
C.F.R. § 404.1545(a)(1)(RFC must be based on all "relevant evidence"). The RFC must
consider the alleged physical, mental, and environmental restrictions. § 404.1545(b-d).

The ALJ's finding that Plaintiff was capable of a limited range of exertionally light
work is well supported and well explained.  The ALJ noted that the plethora of imaging
studies from 2009 forward showed, at most, mild abnormalities (Tr. 32).  The ALJ noted that
the imaging studies results were monotonously unremarkable:

> An April 2011 head/brain CT was normal.  A July 2011 chest x-ray was
> normal.  An August 2011 abdomen and pelvic CT was essentially normal.  A
> gallbladder scan returned results that were in the lower limits of normal.  An
> October 2011 chest x-ray was normal.  A November 2011 x-ray was normal.
> A July 2012 abdomen CT revealed only a tiny non-obstructing stone in the left
> kidney.  An October, 2011 gallbladder ultrasound was negative.  A November
> 2012 abdomen CT revealed only tiny non-obstructing calcification in the left
> kidney.  A January 2013 head CT revealed no acute intracranial process.  An
> April 2013 abdomen CT showed no evidence of acute obstructive uropathy
> (Tr. 32)(internal citations omitted).

Moreover, the above findings, drawn from the ALJ's full-blown discussion of the medical
records from 2009 onward, is consistent with my own review of the record which shows
overwhelmingly normal imaging studies of everything from the top of Plaintiff's head to her
feet. *See* Section **II.B**.

On a related note, Plaintiff takes issue with the ALJ's citation to Dr. Ledtke's
January, 2013 remark that the treatment for Lyme disease had been infrequent (Tr. 37).  She

points out that under SSR 96–7p, 1996 WL 374186, *7 (1996), an ALJ  must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment.  Plaintiff contends that her failure to seek treatment from Dr. Ledtke was attributable to her financial limitations.

However, while Plaintiff claims that her treatment was compromised by financial need, she was able to obtain numerous expensive and sophisticated imaging studies during the same period that she claims to have lacked the resources to obtain treatment for Lyme disease.  The ALJ's inference that Plaintiff's failure to seek treatment was due to mild symptomology (rather than financial constraints) is amply supported by the record.

Plaintiff also makes much of the fact that the ALJ included Hidradenitis Suppurativa among the severe impairments at Step Two followed by "Lyme disease" in parentheses (Tr. 27).  Plaintiff, noting that Hidradenitis Suppurativa and Lyme disease are two distinct conditions, asserts that the ALJ erroneously conflated the two separate diseases in his analysis.  However, the ALJ referenced the listings for both Hidradenitis Suppurative and Lyme disease, noting that as to the former condition, Plaintiff could not show "extensive skin lesions involving both axillae, both inguinal areas or the perineum that persist for at least 3 months despite continuing treatment as prescribed" (Tr. 28)(*citing* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 8.06).  Plaintiff argues that Dr. Bello's February, 2012 finding that she did not

-18-

meet a listed impairment at Step Three is contradicted by June, 2012 treating notes stating that she reported "abscesses occasionally" (Tr. 1028).  However, even assuming that Plaintiff could establish that she experienced the condition on a long-term basis, the June, 2012 records do not suggest that she met the Listing's requirement that the abscesses/lesions were "extensive," and involved both "both axillae, both inguinal areas or the perineum" as required by the Listing.  Plaintiff's failure to show that the newer records establish disability under Listing 8.06 also defeats her argument that Dr. Bello's February, 2012 finding that she did not meet a listing is "outdated," and that the June, 2012 treating records support the need for an updated assessment.[5]  Dr. Bello's ultimate conclusion that Plaintiff's "multiple medical issues" were "[intermittent]" is not contradicted by the records created after February, 2012.

Further, while Plaintiff takes issue with the parentheses around the term "Lyme disease" in the Step Two findings, the ALJ did not give short shrift to the condition in the Step Three analysis or elsewhere in the determination (Tr. 28).  She noted that a finding of disability due to Lyme disease at Step Three required "'repeated manifestations of inflammatory arthritis, with at least two of the constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss),'" accompanied by marked limitations in activities of daily living, social functioning, or concentration, persistence, or pace (Tr.

---

[5]
Further, Plaintiff cites transcript page 931 through 937 in support of her contention that Dr. Bello "did not even consider Listing 8.06." *Plaintiff's Brief* at 20.  In fact, Dr. Bello found explicitly that Plaintiff did not meet Listing 8.06 and provided a rationale for his determination (Tr. 930).

28)(*citing* 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 14.09(D)).   With nothing more, the ALJ's finding that Plaintiff did not experience marked limitations in any of the above-listed areas defeats her argument that she meets Listing 14.09(D) (Tr. 28-29).

In addition, Plaintiff argues that while the ALJ purportedly accorded great weight to Dr. Brannon's consultative examination findings, Dr. Brannon's finding that psychological problems would "be a challenge in the workplace" required more stringent limitations than "simple routine tasks consistent with unskilled work" as found in the hypothetical question to the VE and the RFC (Tr. 30, 76).  Plaintiff contends that the modifiers of simple, routine, and unskilled were insufficient to address her full degree of limitation.

This argument is a red herring.  First, as noted by the ALJ, the finding that Plaintiff's social limitations were only "mild," is supported by her admitted ability to get along with family, attend school activities, go to church, and spend "an hour at her children's school, three to five days each week" (Tr. 29).   Second, even assuming that Plaintiff experienced a greater degree of social limitation, the VE testified that if she were limited to "superficial interactions with coworkers, supervisors, and the public, or, were limited to "a static environment with few changes," she would be nonetheless capable of a significant range of work (Tr. 82-83).  Thus, Plaintiff is unable to demonstrate how a remand for the inclusion of the above-stated "social limitations" would change the result.

Plaintiff related argument that the modifiers of simple, routine, and unskilled  were inadequate to reflect moderate limitation in concentration, persistence, and pace does not

provide grounds for remand.  Case law from the Sixth Circuit and this district  suggests that the modifiers of simple, routine, and unskilled are sufficient to account for moderate concentrational difficulties. *Smith–Johnson v. Commissioner of Social Sec.*, 579 Fed. Appx. 426, 437,  2014 WL 4400999, *10 (6th Cir. September 8, 2014)(moderate concentrational limitations in carrying out detailed instructions and maintain attention and concentration for extended periods adequately addressed by restricting the claimant to unskilled, routine, repetitive work); *Despain v. Commissioner of Social Sec.,* 2014 WL 6686770, *12 (E.D.Mich. November 26, 2014)(same); *Lewicki v. Commissioner of Social Sec.,* 2010 WL 3905375, *2 (E.D.Mich. Sept.30, 2010)(the modifiers of "simple routine work" adequately accounted for the claimant's moderate concentrational deficiencies).[6]

## B. Credibility

Plaintiff also takes issue with the finding that her daily activities support the non-disability finding. *Plaintiff's Brief* at 23-25.  She also argues that her obesity was not taken into consideration. *Id.* at 25.

---

[6]

Plaintiff cites *Ealy v. Commission of Social Sec.,* 594 F.3d 504, 516-517 (6th Cr. 2010) in support of her argument that her concentrational limitations were not adequately addressed in the hypothetical question to the VE.  However, *Ealy* does not hold that the terms "simple, repetitive," "routine" or similar modifiers are intrinsically inadequate to address moderate deficiencies in concentration, persistence, or pace. Rather, the *Ealy* Court determined that the hypothetical limitations of "simple, repetitive" (drawn from a non-examining medical source conclusion) impermissibly truncated the same source's conclusion that the claimant should be limited to "simple repetitive tasks to '[two-hour] segments over an eight-hour day where speed was not critical.' " *Id.*, 594 F.3d at 516. The position that "simple and repetitive" or synonymous terms are always insufficient to address moderate concentrational deficiencies reflects an erroneous reading of *Ealy.*

The credibility determination, guided by SSR 96-7p, describes a two-step process for evaluating symptoms. "First, the adjudicator must consider whether there is an underlying medically determinable physical or mental impairment. . .that can be shown by medically acceptable clinical and laboratory diagnostic techniques." 1996 WL 374186 at *2 (July 2, 1996). The second prong of SSR 96-7p directs that whenever a claimant's allegations regarding "the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence," the testimony must be evaluated "based on a consideration of the entire case record." *Id.* [7]

Plaintiff's argument that the ALJ failed to comply with the procedural or substantive requirements of SSR 96-7p is without merit. The ALJ provided an extensive discussion of the treating history, acknowledging the applicable diagnoses, but permissibly found that the extensive imaging studies provided weak support for the disability claim (Tr. 31-35). At the second step of the credibility determination, the ALJ applied the factors found in in 20 C.F.R.

---

[7]In addition to an analysis of the medical evidence, C.F.R. 404.1529(c)(3) lists the factors to be considered in making a credibility determination:

 (i) Your daily activities; (ii) The location, duration, frequency, and intensity of your pain or other symptoms; (iii) Precipitating and aggravating factors; (iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms; (v) treatment, other than medication, you receive or have received for relief of your pain or other symptoms; (vi) Any measures you use or have used to relieve your pain or other symptoms ... and (vii) Other factors concerning your functional limitations and restrictions due to pain or other symptoms."

-22-

§ 1529(c)(3) (Tr. 35-36). In support of her rejection of the unsupported allegations, the ALJ noted that more recent records showed that the symptoms of Lyme's disease were well controlled with medication (Tr. 37). Contrary to Plaintiff's claim that her activities were severely limited by Lyme's disease, fibromyalgia, Hidradenitis Suppurative, and IBS, the ALJ noted that Plaintiff was able to prepare her children for school, drive them to school, prepare meals, do laundry, wash dishes, sweep, dust, shop for groceries, and take care of pets (Tr. 37). While Plaintiff argues, in effect, that she performed these activities only intermittently, the record supports the ALJ's conclusion that the activities were performed on a regular basis. Plaintiff testified that she was responsible for preparing her children for school and presumably, was responsible for child care activities until her husband came home later in the day (Tr. 55). Plaintiff's acknowledgment that she was able to participate in activities at her children's school several days a week also supports the finding that she was able to perform child-rearing activities on a regular rather than sporadic basis (Tr. 29).

Likewise, the ALJ's failure to address possible work-related limitations created by obesity does not provide grounds for remand. Plaintiff testified that she stood 5' 1" and weighed 191 pounds, which is the equivalent to a Body Mass Index ("BMI") of 36.1[8] (Tr. 50). SSR 02–1p classifies individuals with a BMI greater to or equal to 30.0 as "obese." SSR 02-1p, 2002 WL 34686281 (September 12, 2002).

---

[8]

http://www.cdc.gov/widgets/healthyliving/index.html. (Last visited March 7, 2016).

-23-

In the instance that a claimant is found to be obese, the Commissioner must conduct an individualized assessment of the impact of the claimant's obesity on his or her functional abilities. SSR 02–1p.  However, when determining the impact upon an individual's ability to function, SSR 02–1p "does not mandate a particular mode of analysis, but merely directs an ALJ to consider the claimant's obesity, in combination with other impairments, at all stages of the sequential evaluation." *Nejat v. Commissioner of Social Sec.,* 359 Fed. Appx. 574, 577 (6th Cir.2009)(citation and internal quotation marks omitted).

Plaintiff is correct that the administrative opinion contains no reference to obesity. However, none of the records show that she reported obesity-related limitations.  Plaintiff did not include obesity as one of the conditions that caused work limitations in her application for benefits or testify to limitations resulting from obesity (Tr. 263).  Once again in her present brief, she does not specify how, if at all, obesity affects her ability to perform light work.  Because she has failed to show how a discussion of her obesity would change the ALJ's decision, the omission of mention to the condition does not provide grounds for remand.  Plaintiff "'ha[s] the burden of showing specifically how the obesity, in combination with other impairments, limited her ability to a degree inconsistent with the ALJ's RFC determination.'" *Boley v. Commissioner of Social Sec.*, 2013 WL 1090531, at *4 (E.D.Mich.March 15, 2013)(*citing Smith v. Astrue*, 639 F.Supp.2d 836, 846–47 (W.D.Mich.2009).  "Accordingly, even assuming the ALJ erred by failing to discuss the effects of her obesity and violated SSR 02–1p, the Social Security Ruling concerning the

evaluation of obesity in disability claims, Plaintiff has failed to show this error was harmful such that remand or reversal is warranted." *Boley,* at *4.

Despite the staggering length of the transcript, the ALJ's determination that Plaintiff was capable of a significant range of unskilled light work as of August 28, 2013 is well within the "zone of choice" accorded to the fact-finder at the administrative hearing level and should not be disturbed by this Court. *Mullen v. Bowen*, *supra*.

## CONCLUSION

For the reasons stated above, I recommend that Defendant's motion for summary judgment be GRANTED and that Plaintiff's motion for summary judgment be DENIED.

Any objections to this Report and Recommendation must be filed within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir. 1991); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS,* 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within fourteen (14) days of service of any objecting party's timely filed objections,

-25-

the opposing party may file a response.  The response shall be not more than twenty (20) pages in length unless by motion and order such page limit is extended by the court.  The response shall address specifically, and in the same order raised, each issue contained within the objections.

s/ R. Steven Whalen
R. STEVEN WHALEN
UNITED STATES MAGISTRATE JUDGE

Dated: March 7, 2016

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing document was sent to parties of record on March 7, 2016, electronically and/or by U.S. mail.

s/Carolyn M. Ciesla
Case Manager to the
Honorable R. Steven Whalen